# In the United States Court of Federal Claims

|  |  |
|---|---|
| ADVANTAGED SOLUTIONS, INC., | No. 25-cv-1806 |
| Plaintiff, | Filed Under Seal: January 30, 2026 |
| v. | Publication: February 6, 2026[1] |
| THE UNITED STATES, | |
| Defendant, | |
| and | |
| OAKLAND CONSULTING GROUP, INC., | |
| Intervenor-Defendant. | |

*Jeffrey M. Chiow* of Greenberg Traurig, LLP, Washington, D.C., argued for Plaintiff. With him on the briefs were *Pamela Marple* and *Christopher O'Brien* of Greenberg Traurig, LLP, Washington, D.C.

*Reta Emma Bezak* of the United States Department of Justice, Civil Division, Washington, D.C., argued for Defendant. With her on the briefs were *Geoffrey M. Long* and *Patricia M. McCarthy* of the United States Department of Justice, Civil Division, and *Brett A. Shumate*, Assistant Attorney General. Also with her on the briefs was *Ashley Kelly*, Supervisory Counsel of the Defense Logistics Agency.

*John R. Tolle* of Barton, Baker, Thomas & Tolle, LLP, McLean, Virginia, argued for Intervenor-Defendant.

## **MEMORANDUM AND ORDER**

This post-award bid protest concerns a solicitation to procure a software update for the

Defense Logistics Agency's (DLA or Agency) Enterprise Resource Planning (ERP) platform.

---

[1] This Memorandum and Order was filed under seal, in accordance with the Protective Order entered in this case. ECF No. 8. On February 6, 2026, the parties confirmed with the Court that that there were no proposed redactions. The sealed and public versions of this Memorandum and Order are identical, except for this footnote, the publication date, and the addition of counsels' names.

Plaintiff, Advantaged Solutions, Inc. (ASI or Plaintiff), is a minority-owned business and authorized reseller of SAP products and services, with its principal place of business in Washington, D.C.  ECF No. 1 (Complaint or Compl.) ¶ 1.  Defendant, the United States, acted through DLA in this matter.  "The Defense Logistics Agency (DLA) is a United States (US) Department of Defense (DoD) agency that provides worldwide logistics support for the missions of the Military Departments and the Unified Combatant Commands under conditions of peace and war."  AR at 15.  Intervenor-Defendant, Oakland Consulting Group, Inc., (Oakland) is a business which also offers licensed, SAP-based ERP support.  AR 1386.

In its initial selection decision, DLA deemed Oakland's proposal deficient and awarded the contract to ASI.  However, immediately after making the award, DLA discovered an issue with the evaluation process: its evaluators had assigned ASI and Oakland different ratings for their technical approach, even though their proposals were identical in that regard.  DLA rescinded the contract, reevaluated the proposals, and ultimately awarded the contract to Oakland for approximately $130 million.  Plaintiff's protest follows.  Plaintiff challenges DLA's corrective action, its final award to Oakland, and alleged descoping of the solicitation as arbitrary and capricious or unlawful.

## FACTUAL HISTORY

DLA uses an ERP platform "to establish end-to-end processes to fulfill acquisition, logistics and financial reporting requirements, streamline and use data sources effectively, reduce inefficient or non value-added operations, and audit its resources."  AR 4.  The ERP platform relies predominately on brand-name software provided by SAP Public Services, Inc.  AR 4, 6. It also requires lifecycle refreshes—in this case, DLA must upgrade the ERP platform with a newer version of several SAP programs: SAP S/4HANA Private Cloud Edition 2025, SAP Ariba Sourcing and Procurement for Public Sector in S/4HANA (SAP S/4 PPS), and SAP Bulk Fuels

Management 4.0 (BFM). AR 15–16. This bid protest arises from DLA's procurement for the "design, build, test, training and deployment of SAP S/4 PPS and BFM 4.0." AR 4.

On April 28, 2025, DLA released a request for quotations (RFQ or solicitation) for brand-name SAP Support Services against a Department of Defense (DOD) Enterprise Software Initiative (ESI) Blanket Purchase Agreement (BPA) issued under a General Services Administration (GSA) Federal Supply Schedule (FSS) Multiple Award Schedule contract. AR 71, 3. DLA issued a limited source justification to purchase brand-name SAP services from an authorized SAP reseller. AR 3. The RFQ stated that the basis for award would be the "lowest priced, technically acceptable offer based upon the total price for all items contained within this solicitation and the corresponding Performance Work Statement (PWS)." AR 71.

As one of Plaintiff's allegations centers around purportedly improper reductions to the scope of the solicitation, the Court must examine the content of the original solicitation. According to the original solicitation, DLA would evaluate each solicitation using three non-price factors: (1) Level of Effort/Labor Mix, (2) Key Personnel, and (3) Technical Approach." AR 72. "Technical acceptability requires being acceptable for all non-price factors and meeting all requirements" of the Performance Work Statement (PWS). *Id.* Originally, the scope of solicitation included seven (7) tasks: (1) Program Management and Administration Services; (2) Environment Build and Transition; (3) Execution; (4) Testing, Evaluation, and Documentation; (5) DIBBS Modernization; (6) Human Performance; and (7) Hypercare, Transition to Post Production Support and Site Development. AR 20–38. Over the several months before the initial award, DLA amended the solicitation 11 times. *See* AR 788 (Amendment 11). The most significant amendment was Amendment 5, dated September 17, 2025, because it significantly trimmed down the scope of

(descoped) the PWS.  AR 1786–88.  Among other things, Amendment 5 eliminated Task 6 of the PWS: Human Performance.  *See* AR 688–89.

Another important requirement of the solicitation is that the ERP upgrade requires a "Hybrid Agile approach."  AR 20.  This "Hybrid Agile approach" means "continuous requirements evaluation, effective integration, testing, evaluation, cybersecurity, implementation, and the use of automation [in] the development processes, where possible, to help ensure programs and projects are executed successfully.'"  AR 278.  The evaluation of Plaintiff's and Oakland's "Hybrid Agile" sections in their proposals also becomes a central question in this bid protest.

On May 30, 2025, offerors ASI and Oakland both submitted timely proposals.  *See* AR 789; 1384.  DLA found deficiencies in both proposals during the initial technical evaluation.  AR 1590–91; AR 1595.  Namely, as DLA informed both Plaintiff and Oakland, the proposals failed to fulfill PWS Section 3.3 Task 3: Execution by failing to "propose[] a Hybrid Agile Method" and were "resource intensive based on continuous feedback."  AR 1591; AR 1595.

In answer to DLA's letters informing each of its proposal deficiencies, Plaintiff and Oakland provided identical responses in an attempt to remedy their proposals' flaws.  AR 1598–99; 1678.[2]  In the section of each response titled "Agile Delivery Components," both offerors stated that "'Business involvement is limited to a few subject matter experts for each Agile team," and that "We plan to work side by side with key DLA stakeholders during the design and build

---

[2] The responses are virtually identical, with differences only in capitalization, punctuation, and the occasional shortening of a word.  *Compare* AR 1598–99 *with* 1678.  Since the responses are otherwise the same, the Court will refer to them as "identical" throughout this Memorandum and Order.

phases to facilitate real-time decision-making and feedback, improving efficiency and reducing rework." AR 1599 (Plaintiff's response), 1678 (Oakland's response).[3]

In July 2025, after reviewing this response, DLA deemed the deficiency in Plaintiff's Hybrid Agile Methodology section resolved and found Plaintiff's proposal technically acceptable. AR at 1711–12. The Agency explained that "[Plaintiff's] proposal revision stated that they will use a Hybrid Agile method coupled with a traditional waterfall delivery. [Plaintiff] stated, 'Business involvement is limited to a few subject matter experts for each Agile team.' [H]ighlighting SME's gets to the right level of support. This deficiency has been resolved." AR 1711.

Meanwhile, a different team of evaluators at DLA found Oakland's offer technically *un*acceptable, even after reviewing Oakland's identical response, citing the following reasons:

> [T]he vendor does not accurately identify the teams needed. The vendor stated in their revised proposal, "We plan to work side by side with key DLA stakeholders during the design and build phases to facilitate real-time decision-making and feedback, improving efficiency and reducing rework." DLA stakeholders are the management layer and may not be the correct team. As a result, the deficiency remains.

AR 1720; *see* AR 3115 (detailing how the evaluation team "split up" the work of evaluating the proposals). On September 17, 2025, in a letter informing Oakland of Amendment 5, DLA once again highlighted Oakland's deficiency in its proposed Hybrid Agile Methodology: "The vendor's revised proposal . . . satisfied a portion of this deficiency, however the vendor does not accurately identify the teams needed." AR 1787. In response, Oakland modified its Hybrid Agile Methodology section but continued to use the language of "DLA stakeholders." *Compare* AR

---

[3] Identical language in procurements involving brand-name SAP services is not unusual and, according to DLA, even to be expected, as proposals will often use the same subcontractors who provide this language. *See infra* at 6 (citing AR 3114).

1720 *with* AR 1996.    DLA determined that, while Oakland had "partially addressed" the deficiency, its Hybrid Agile Methodology section remained deficient, as the proposal failed "to meet the Government requirement of engaging DLA's business community at the right level."  AR 2620.

Also during the bidding process, the Department of War team for the Department of Government Efficiency (DOGE) became involved in the procurement.    AR 2631.   When informing the bidders about the final amendment (Amendment 11), on September 26, 2025, DLA indicated that the DOGE team "is concerned about some of the labor pricing being too high," and asked the bidders whether their pricing could be updated.  *See* AR 2631, 2627.  Neither Plaintiff nor Oakland changed their pricing in response.  *See* AR 2643, 2638.  While Oakland did not alter its pricing, it added language to its Hybrid Agile Methodology section while continuing to highlight "a few subject matter experts for each Agile team" and "key DLA stakeholders."  AR 2650.    DLA's final evaluation of Oakland stated that the continued use of the term "DLA stakeholders" demonstrated a "material failure" to meet the "requirement of engaging DLA's business community at the right level."  AR 2724.  DLA therefore determined Oakland's proposal was technically unacceptable.  *Id.*  On September 29, 2025, DLA awarded ASI, the sole technically acceptable offeror, the contract for SAP services.  AR at 2744–45.

On October 2, 2025, DLA discovered that "[t]he deficiency that [DLA] identified with the Oakland response was also uncovered [Plaintiff's] response today."  AR 3110.  In internal Agency correspondence, DLA explained "'how' the Tech Eval process missed a key step."  AR at 3114.  The emails mention that DLA typically assumes that the responses in a brand-name software services procurement like this will all be identical.  AR 3114.  This is because all bidders usually

work with the same subcontractors.  *Id.*  In this case, however, that assumption "apparently was overlooked and therefore escaped the usual parties throughout the process."  *Id.*

In emails dated October 6, 2025, a DLA site manager asked for confirmation that both Plaintiff's and Oakland's proposals had the same language.  AR 3112.  He then asked his DLA team that, if the language is identical, whether "the deficiency language was resolved by both offerors, and therefore they are both Acceptable, or does the deficiency stand for both offerors, and therefore they are both Unacceptable."  *Id.*  The response email answers that "[b]ased on the back and similar language on 'stakeholder engagement' then both vendors can be considered Acceptable."  *Id.*

The next day, on October 7, DLA issued Plaintiff a stop-work order that explained "[d]uring post-award review, the Government identified an issue with the evaluation of offers process which requires corrective action, including re-evaluation of offers."  AR at 3118.  In its response to the stop-work order, Plaintiff stated that, "[i]f this causes you to re-address our award, we hope and respectfully request that if the Government finds an issue with your evaluation that ASI [be] given the opportunity to renegotiate through a best and final opportunity."  AR 3121.  DLA then re-evaluated Oakland's technical proposal and the previously-identified deficiency in the Hybrid Methodology Approach and determined that the "initial identification of deficiencies in this area was based on a misinterpretation of the vendor's approach.  This assessment has been corrected."  AR 3126.  DLA subsequently asked both offerors to submit best and final offers, wherein each could revise any aspect of the proposal.  AR 3132, 3135.

The next day, prior to the deadline for best and final offers, ASI submitted an agency-level protest asserting that its price had been revealed to other offerors, giving the other offerors an advantage.  AR 3161.  ASI asked the Agency to cancel the procurement and issue a new

solicitation. *Id.* On October 14, 2026, Agency sustained the protest but did not cancel the procurement; instead, DLA rescinded the request for best and final offers, declaring that it would instead re-evaluate the final proposals received prior to the initial award. AR 3171. No party protested that decision. On October 14, 2025, DLA released the final technical evaluations for Oakland and ASI. AR 3172–89. It also released an Award Decision Document Addendum (ADD or Addendum), where it concluded that Oakland's price was lower, and its proposal was technically acceptable, so it was therefore the lowest-priced technically acceptable offer. AR 3191–92 (noting Oakland's offered price of $130,398,773.02 was $4,117,875.42 less than ASI's price of $134,516,648.44). Accordingly, DLA terminated the contract with ASI and awarded it to Oakland. AR 3197–98, 3201. This protest follows.

## PROCEDURAL HISTORY

On October 24, 2025, Plaintiff filed its bid protest with this Court. *See* Complaint. On October 29, Oakland filed a Motion to Intervene, which the Court granted the same day. *See* ECF No. 10 (motion); ECF No. 18 (granting Oakland leave to intervene).

On December 5, 2025, Plaintiff and Intervenor-Defendant filed their Motions for Judgment on the Administrative Record (MJAR). *See* ECF Nos. 33 (Oakland MJAR or Oak. MJAR), 34 (Plaintiff's MJAR or Pl. MJAR). On the same day, Defendant filed its Partial Motion to Dismiss and Motion for Judgment on the Administrative Record. *See* ECF No. 35 (Defendant's Partial Motion to Dismiss and MJAR or Def. Mot.). On December 19, 2025, Defendant and Intervenor-Defendant filed their Responses to Plaintiff's MJAR, and Plaintiff filed its Response to Defendant's Motion to Dismiss and MJAR. *See* ECF Nos. 41 (Pl. Resp.), 42 (Def. Resp.), 43 (Oak. Resp). The parties filed their Replies in support of their MJARS on January 5, 2026. ECF Nos. 45 (Pl. Reply), 46 (Def. Reply), 47 (Oak. Reply). On January 15, 2026, the Court conducted

oral argument on the pending motions.  *See* Minute Entry dated January 15, 2026; *see also* Transcript dated January 15, 2026 (ECF No. 54) (OA Tr.).

**APPLICABLE LEGAL STANDARDS**

In the Court of Federal Claims, bid protests are adjudicated under Rule 52.1(c), which provides an expedited trial on a "paper record, allowing fact-finding by the trial court."  Rule 52.1(c) of the Rules of the United States Court of Federal Claims (Rule(s)); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (referencing Rule 56.1, which was replaced by Rule 52.1(c)).  Unlike at summary judgment, genuine disputes of material fact do not preclude the Court from granting a motion for judgment on the administrative record.  *Bannum*, 404 F.3d at 1357.  This Court is empowered to provide any relief, including declaratory or injunctive relief, that it deems proper.  28 U.S.C. § 1491(b)(2); *Oak Grove Techs., LLC v. United States*, 116 F.4th 1364, 1375 (Fed. Cir. 2024)

### i.  Blue and Gold

"It is settled law that 'a party who has the opportunity to object to the terms of a government solicitation . . . and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest.'"  *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 121–22 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023) (quoting *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007)).  This is so even where "a challenge to the terms of the solicitation" is "characterize[d] . . . as a challenge to the evaluation of [an awardee's] proposal."  *DevTech Sys.*, 176 Fed. Cl. at 321 (citing *Blue & Gold*, 492 F.3d at 1313).  The Federal Circuit has held that the reasoning of *Blue & Gold* applies to "all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so."  *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012).

Accordingly, to preserve a challenge to a procurement action in this Court, a plaintiff must formally protest the error before the procuring agency, the Government Accountability Office (GAO), or the Court of Federal Claims prior to either the close of bidding or the close of award. *See Bannum*, 779 F.3d at 1380; *SEKRI, Inc. v. United States*, 34 F.4th 1063, 1073 (Fed. Cir. 2022) (citing *Harmonia Holdings Grp., LLC v. United States*, 20 F.4th 759, 767 (Fed. Cir. 2021)) ("[A] bidder's 'timely, formal challenge of the solicitation before [the agency] removes [a] case from the ambit of *Blue & Gold* and its progeny.'").

Any objection to a patent error in the terms of the solicitation should be raised prior to the close of bidding. *Blue & Gold*, 492 F.3d at 1313. If knowledge of the error was not possible or objection not practicable until after the close of bidding, then the challenge may be brought prior to award. *COMINT Sys. Corp.*, 700 F.3d at 1382. ("To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter."). *Blue & Gold* waiver "only applies where the protesting party 'had the opportunity to challenge aspects of a solicitation before the award but failed to do so.'" *Kropp Holdings, Inc. v. United States*, 176 Fed. Cl. 512, 555 (2025) (emphasis in original) (quoting *Couture Hotel Corp.*, 138 Fed. Cl. 333, 340 (2018)). For this reason, the Federal Circuit has held that *Blue & Gold* bars claims which could have been raised based on information the Plaintiff "knew, or should have known." *Inserso Corp. v. United States*, 961 F.3d 1343, 1350 (Fed. Cir. 2020).

### ii. Bid Protests

This Court reviews post-award bid protests in two steps. *First*, the Court analyzes the procurement under the Administrative Procedure Act (APA) standard to determine whether the agency "acted without rational basis or contrary to law when evaluating the bids and awarding the contract." *Bannum*, 404 F.3d at 1351; 28 U.S.C. § 1491(b)(4); *see Oak Grove Techs.*, 116 F.4th

at 1374. *Second*, the Court considers whether the alleged errors prejudiced the protestor. *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021) (citing *Bannum*, 404 F.3d at 1351).

For the first step, the APA standard requires a reviewing court to determine whether an agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).   To prevail in a post-award bid protest, a plaintiff must demonstrate that "(1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)). The Court will consider "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018) (quoting *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)).

The agency's decision lacks a rational basis when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view of the product of agency expertise." *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. 2856).  Courts "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).  Indeed, "[a]lthough the inquiry under the APA 'is to be searching and careful, . . . [t]he court is not empowered to substitute its judgment for that of the agency.'" *Insight Pub. Sector,*

*Inc. v. United States*, 161 Fed. Cl. 760, 786 (2022) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416–20 (1971)).  As Federal Circuit has stated, "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1333 (Fed. Cir. 2001) (noting a similarly high burden for claims of a violation of regulation or procedure, which must involve "a clear . . . violation of applicable statutes or regulations")).  Consistent with this high burden, agency decisions are "entitled to a presumption of regularity."  *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)).

At step two, the Court evaluates the factual question of prejudice.  *Sys. Stud. & Simulation, Inc. v. United States*, 22 F.4th 994, 998 (Fed. Cir. 2021); *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020).  A protestor establishes prejudice by showing "that there was a 'substantial chance' it would have received the contract award but for that error."  *Sys. Stud. & Simulation*, 22 F.4th at 998 (quoting *Bannum*, 404 F.3d at 1353); *see also REV, LLC v. United States*, 91 F.4th 1156, 1163 (Fed. Cir. 2024) (noting that a disappointed bidder must have "had greater than an insubstantial chance of securing the contract" (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003))).  In other words, the disappointed bidder must have been "within the zone of active consideration."  *Colonial Press Int'l, Inc. v. United States*, 788 F.3d 1350, 1355 (Fed. Cir. 2015) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)); *see Frawner Corp. v. United States*, 161 Fed. Cl. 420, 455 (2022) (explaining that protestors must show that "barring the error the protestor would have been 'within the zone of active consideration.'" (quoting *Off. Design Grp. v. United States*, 951 F.3d 1366, 1373–74 (Fed. Cir. 2020))).  Only if a protestor has established prejudice

can it prevail. *DevTech Sys., Inc. v. United States*, 176 Fed. Cl. 297, 313 (2025); *see also Sys. Stud. & Simulation*, 22 F.4th at 998 (noting that there is no presumption of prejudice following a procurement error by an agency).

### iii.  Injunctive Relief

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction. *See Centech Grp.*, 554 F.3d at 1037. Success on the merits is "the most important factor required to enjoin the award of [a] contract." *Blue & Gold*, 492 F.3d at 1312.

## DISCUSSION

The Court will first address Defendant's Partial Motion to Dismiss before moving on to the arguments in the parties' MJARs. Plaintiff's Complaint contends that DLA's elimination of elements of the solicitation (descoping) has resulted in a solicitation which does not reflect the Agency's minimum needs. Compl. ¶ 55. Defendant's Motion argues that Plaintiff has waived this challenge under *Blue & Gold*. *See* Def. Mot. at 6–7.[4] For the reasons stated below, the Court concludes that Defendant is correct: by waiting until after the close of bidding and after the initial award, Plaintiff has waived any challenge to the descoping of the solicitation.

Next, the Court will turn to the arguments in the parties' MJARs. In its MJAR, Plaintiff makes three arguments that DLA's actions were arbitrary and capricious: (i) DLA treated Plaintiff unfairly by failing to host equal discussions, (ii) DLA was contradictory and lacked explanation

---

[4] Citations throughout this Memorandum and Order correspond to the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

for its award to Oakland and determination that Oakland's proposal was acceptable, and (iii) DLA's award to Oakland was improperly based on a solicitation that was descoped to the point of failing to meet the Agency's minimum needs. The Court finds that DLA's actions in all three areas had a rational basis; furthermore, Plaintiff has not shown prejudice. As a result, the Court denies Plaintiff injunctive relief.

## I.   Partial Motion to Dismiss

Defendant moves to dismiss Plaintiff's challenges to the descoping of the solicitation as waived under *Blue & Gold*. *See* Def. Mot. at 6–7.[5]   Defendant argues that since Plaintiff did not challenge any of the changes to the scope of the solicitation before September 26, 2025, (the close of bidding for the initial award), Plaintiff has waived this challenge. *Id.*   As Defendant puts it: "ASI waited until bidding had closed, an award had been made, and corrective action had been announced before it submitted an agency-level protest." Def. Reply at 4. Meanwhile, Plaintiff maintains it preserved its challenge to the descoping through its formal agency-level post-award protest on October 9, 2025. Pl. Resp at 9 (citing AR 3161). This agency-level protest letter argues, among other things, that "DLA's corrective action is insufficient," raises the issue that the procurement "no longer reflects [the] Agency's minimum requirements," and requests that DLA "cancel[] the solicitation and issu[e] a new solicitation that reflects the Agency's current needs." AR 3161–62. That this challenge occurred only after the Agency initially awarded Plaintiff the

---

[5] Originally, in Count I of its Complaint, Plaintiff also disputed DLA's decision to take corrective action at all. *See* Compl. ¶¶ 37–47. At oral argument, however, the parties agreed that Count I can be set aside as an issue in this case. *See* OA Tr. 47:20 (Plaintiff's counsel agreeing that it is not pursuing Count I); 47:24–48:5 (Parties agreeing that the issue can be set aside). The Court therefore denies this portion of the Government's Motion as moot. *See Chapman L. Firm Co. v. Greenleaf Constr. Co.*, 490 F.3d 934, 939 (Fed. Cir. 2007) (stating an issue is moot if "during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue").

contract does not matter in Plaintiff's eyes: according to it, *Blue & Gold* is "simply not implicated" because DLA reopened the Solicitation during corrective action. Pl. Reply at 12. Finally, Plaintiff accuses the Government of "myopically focusing" on the descoping challenge. Pl. Resp. at 11. Instead, Plaintiff reframes its descoping challenge as merely saying that DLA "fail[ed] to consider another important aspect of the problem besides its arbitrary and unexplained evaluation flip-flop—that the Solicitation is flawed and does not reflect the [a]gency's actual needs." *Id.* (citing Compl. ¶¶ 48–63).

The Court agrees with Defendant. For challenges to an evident error in the terms of a solicitation, "it is settled law" that *Blue & Gold* sets a deadline of "prior to the close of the bidding process." *Newimar S.A. v. United States*, 160 Fed. Cl. 97, 121 (2022), *aff'd*, No. 2022-1949, 2023 WL 8534614 (Fed. Cir. Dec. 11, 2023) (citing *Blue & Gold*, 492 F.3d at 1313). Applied in the present action, this means Plaintiff needed to raise its objections to the elimination of certain terms of the PWS by September 26, 2025—the deadline for close of bidding set by the last solicitation amendment. *See* AR 788. Plaintiff's attempts to reframe its challenge as a challenge to DLA's evaluation rather than the terms of the solicitation are fruitless. The *Blue and Gold* deadline of the close of bidding applies even where "a challenge to the terms of the solicitation" is "characterize[d] . . . as a challenge to the evaluation of [an awardee's] proposal." *Blue and Gold*, 492, F.3d at 1313; *see DevTech*, 176 Fed. Cl. at 321.

Nor does the decision to take corrective action extend Plaintiff's *Blue & Gold* deadline. Although *COMINT* extended the period of time to file some bid protest challenges until after the close of bidding or even after award, it conditioned this extension to cases where it was "not practicable" for a protestor to challenge beforehand. 700 F.3d at 1382. Here, however, there is no question that Plaintiff had the opportunity to challenge the descoping earlier, before either the close

of bidding or before the first award; Plaintiff did neither.  Upon receipt of Amendment 5 on September 17, 2025, Plaintiff knew of significant changes to the scope of the solicitation.  *See* AR 1726 (informing Plaintiff that "Amendment 5 makes necessary PWS reductions"); AR 1749–52 (showing the elimination of Task 6: Human Performance in the PWS).  Plaintiff then had the opportunity to object to the terms of Amendment 5 when it submitted its proposal in response to Amendment 5.  *See* AR 1846, 1894; *see also* OA Tr. 13:4–5 (Plaintiff's counsel stating that "[T]here's nothing in the record that has a protest at the time of [A]mendment 5.").  From September 18 to the close of bidding on September 26, Plaintiff additionally submitted responses to Amendments 7, 8, and 11.  *See* AR 2075, 2078, 2630.  At no time during these communications did Plaintiff object to the descoping.  Only after winning, and then losing, the award did Plaintiff complain.  This is precisely the kind of wait-and-see approach that is unacceptable in bid protests.  *Blue & Gold*, 492 F.3d at 1314 ("A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.").  "Having [waited], [Plaintiff] cannot now . . . restart the bidding process and get a second bite at the apple."  *COMINT*, 700 F.3d at 1383 (internal quotations omitted).[6]

Plaintiff's agency-level protest later did not preserve its challenge to the descoping, because it came too late.  Plaintiff was content to remain silent after it won the first award and only protested the terms of the work it accepted *after* receiving a stop-work order.  *See* AR 3117 (Stop-Work Order dated October 7, 2025), AR 3161 (agency-level protest dated October 9, 2025).  In sum, Plaintiff was silent in victory and now demurs in defeat.  Plaintiff thus waived its objection

---

[6] Aside from fairness, another "policy behind the forfeiture rule," is to save agency resources by raising remediable issues early on.  *Inserso*, 961 F.3d at 1352.  In contrast, here Plaintiff is "seeking the relief it could have gotten from [the Agency] earlier, before [the Agency] had already expended considerable time and effort evaluating the bidders' proposals."  *Id.*

to changes to the scope of the solicitation.  *See Inserso*, 961 F.3d at 1349; *COMINT*, 700 F.3d at 1382; *Blue & Gold*, 492 F.3d at 1315.

## II.    Motion for Judgment on the Administrative Record

In its MJAR, Plaintiff argues that the Agency acted arbitrarily and capriciously by (i) failing to afford Plaintiff equal discussions during corrective action, (ii) determining Oakland's proposal was acceptable during corrective action, and (iii) awarding based on a descoped solicitation that did not meet the Agency's minimum needs.  Plaintiff argues that it should be granted injunctive relief.  Defendant responds that, because Plaintiff's proposal was always considered acceptable, there was no need to conduct discussions with Plaintiff.  Instead, DLA argues that the correct remedy for disparate treatment of Oakland was exactly the course of action that DLA undertook: reevaluation of both proposals, this time using a consistent standard.  Finally, Defendant argues that, even if Plaintiff had not waived its challenge to the descoping under *Blue & Gold*, that Plaintiff has not sufficiently overcome the presumption that the government is in the best position to determine its own needs.  Intervenor-Defendant Oakland supports Defendant's arguments that Defendant acted rationally and in accordance with law, and accordingly asserts that Plaintiff is not entitled to injunctive relief.[7]  The Court agrees with Defendant and Oakland and finds that it acted with a rational basis on all three issues.

### A.    Unequal Discussions

"When procedural violations committed by the agency are egregiously removed from fairness, this constitutes an abuse of the agency's administrative discretion."  *Progressive Indus., Inc. v. United States*, 129 Fed. Cl. 457, 477 (2016) (citing *Doty v. United States*, 53 F.3d 1244,

---

[7] As Oakland's briefing, for the most part, supports Defendant's position using similar arguments, the Court primarily references Defendant's briefing throughout this Memorandum and Order.

1251 (Fed. Cir. 1995)). "Uneven treatment" of offerors may constitute a violation of the "standard of equality and fair-play that is a necessary underpinning of the federal government's procurement process" and may "amount[] to an abuse of the agency's discretion." *PGBA, LLC v. United States*, 60 Fed. Cl. 196, 207 (2004) (citing *Doty*, 53 F.3d at 1251). Here, Plaintiff asserts that DLA acted arbitrarily and capriciously because it held multiple discussions with Oakland but not with Plaintiff, therefore purportedly denying Plaintiff an equal opportunity to respond to the Agency's concerns about the Hybrid Agile Methodology portion of its proposal. Pl. MJAR at 22–23. In other words, Plaintiff contends that since both ASI and Oakland had an unresolved material deficiency, but only Oakland was given an opportunity to resolve that deficiency through multiple discussions, DLA treated ASI unequally. *Id.*; Pl. Reply at 9. In support of its argument, Plaintiff cites FAR 15.306(d)(3), which details how discussions should at minimum inform the offeror of its deficiencies. *Id.* at 10. Plaintiff also notes that "where an [a]gency engages in such exchanges in the context of a GSA Schedule procurement, they must be meaningful and equal." *Id.* at 10–11 (citing *Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 411, 414 (2018)); *Ernst & Young, LLP v. United States*, 136 Fed. Cl. 475, 515–17 (2018)). According to Plaintiff, whether the supposed inequality was inadvertent does not matter; "inadvertency is irrelevant in assessing whether discussions were misleading." Pl. Reply at 10 (citing[8] *Analytical & Rsch. Tech.*, 39 Fed. Cl. 34, 48 (1997); *see also Analytical & Rsch. Tech.*, 39 Fed. Cl. at 48 (quoting *SRS Techs.*, B-254425, 94-2 CPD ¶ 125, 1994 WL 576118 at *3 (Comp. Gen. Sep. 14, 1994)) ("An agency may not inadvertently mislead an offeror, through the framing of a discussion question, into responding

---

[8] While Plaintiff attributes this quotation to *Analytical & Rsch. Tech.*, this precise quotation does not appear in that case. *See* 39 Fed. Cl. at 48. The line appears to come from *Caddell Constr. Co. v. United States*, 125 Fed. Cl. 30, 46 (2016), which also cites *Analytical & Rsch. Tech.*

in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies; or the government's requirements.").

Plaintiff's argument hinges on the premise that both Plaintiff's proposal and Oakland's proposal contained identical, deficient language.  Plaintiff emphasizes parts of the record where individual DLA employees (not including the contracting officer) seem to indicate, upon first glance, that Plaintiff's proposal language was deficient.  *See* Pl.'s Resp. at 8 (citing AR 3110 ("The deficiency that we identified with the Oakland response was also uncovered in the ASI response today.")); AR at 3112 ("After the award it was noticed by one of the staff that we had not called out a similar language deficiency 'Stakeholder' for ASI and therefore they were not tasked to fix their language")).

In response, Defendant argues that Plaintiff's argument fails because DLA never found Plaintiff's proposal to be deficient.  Def. Resp. at 3, 5.  Before corrective action, Plaintiff was deemed acceptable and awarded the contract.  AR 2744–45.  After the stop-work order and the start of corrective action, DLA again found Plaintiff's offer acceptable in the final technical evaluation and the final award decision addendum.  *See* AR 3172, 3191.  As for the internal emails, Defendant's counsel argued that the emails were not "made in the context of making an evaluation determination or . . . an award decision."  OA Tr. 61:2–4.  Nor, Defendant argues, do the emails reflect a determination that the proposals themselves are deficient; rather, they identify a more ambiguous "deficiency language."  Def. Resp. at 3–4.  Defendant concludes that as Plaintiff was not deficient, there was no reason to give it an "opportunity" to fix a non-existent deficiency.  *Id.* at 3.

After reviewing the record and applicable law, the Court agrees with the Defendant; DLA did not treat Plaintiff unequally.  There are two reasons Plaintiff's argument fails here.  *First*,

Plaintiff's line of reasoning relies on its unsupported assertion that its own proposal had a deficiency about which it should have been informed and given the opportunity to amend.[9]  Putting aside the peculiarity of a bid protestor arguing that its proposal should have been deemed unacceptable for award, the record indicates otherwise.  Indeed, context matters.  While DLA internal emails colloquially refer to a "deficiency" or "deficiency language" found in Plaintiff's proposal, such email language is always in the context of investigating the potentially disparate treatment of Plaintiff and Oakland.  *See* AR 3110 ("The deficiency that we identified with the Oakland response was also uncovered in the ASI response today"); AR 3112 ("After the award it was noticed by one of the staff that we had not called out a similar language deficiency 'Stakeholder' for ASI").  Moreover, these internal emails, while contemporaneous, are not determinative evaluations of either Plaintiff's or Oakland's proposal.  *See Eisenhower Real Est. Holdings, LLC v. United States*, 139 Fed. Cl. 491, 496 (2018) (internal agency communications that "reflect internal confusion" over procurement do not constitute an agency decision).  All official Agency evaluations of Plaintiff's proposal consistently deem it acceptable.  *See* AR 1711, 3172, 3191.

Overall, the record demonstrates that DLA's favorable evaluation of Plaintiff remained constant; and as so, there was no need to ask it to revise its proposal or to conduct discussions to that end.  *See Unisys Corp. v. United States*, 89 Fed. Cl. 126, 140–41 (2009) (holding discussions with only one offeror "did not violate the requirement of fundamental unfairness" that applies in

---

[9] Although Plaintiff complains that it had no chance to revise its proposal during corrective action, DLA abandoned its plan to let offerors submit amended proposals during corrective action in response to Plaintiff's own objection during the agency-level protest that doing so would put Plaintiff at a disadvantage, since its pricing had been revealed.  AR 3171.

FAR Subpart 8.4 procurements when discussions would not have helped protester); *see also Garrett Elecs., Inc. v. United States*, 163 Fed. Cl. 632, 661 (2023) (noting that discussions should be "meaningful and "should generally address weaknesses or deficiencies in an offeror's proposal that, unless corrected, would preclude award." (internal citations omitted)); *Integrated Fin. & Acct. Sols., LLC v. United States*, 161 Fed. Cl. 475, 491 (2022) (discussions not subject to FAR Part 15 requirements during Subpart 8.4 procurements as long as discussions do not create "unfairness"); *see also Centerra Grp., LLC v. United States*, 138 Fed. Cl. 407, 415 (2018) ("The caselaw from this court is also generally supportive of testing discussions undertaken during FSS procurements by the fairness principles enshrined in FAR Part 15, although adherence to FAR Part 15 procedures is not required."). Accordingly, the Court finds that DLA acted reasonably and fairly when it conducted multiple discussions with Oakland and not Plaintiff, whose proposal DLA had consistently deemed acceptable.

### B.    Reevaluation of Oakland as Acceptable

Plaintiff further objects to DLA's award to Oakland and claims that in so doing, DLA "contradicted its previous, repeated conclusions that this deficiency rendered a proposal unacceptable and simply decided both offerors could be found acceptable without any explanation or attempt to reconcile the conflicting evaluations." Pl. MJAR at 20. Again relying on the unsupported notion that Plaintiff's own proposal was deficient, Plaintiff argues that restoring Oakland's evaluation to the same favorable outcome as that of its twin was entirely backwards, because "the record is clear that the problem was always with the evaluation of ASI's proposal." Pl. Reply at 8 (citations omitted). Plaintiff emphasizes the fact that Oakland's proposal was denied three times during the procurement process. Pl. Resp. at 6, n.2; OA Tr. 79:17–20. As a result, Plaintiff contends that DLA appears to have arbitrarily ignored Oakland's deficiency. Pl. MJAR at 21. In this manner, according to Plaintiff, DLA violated the "fundamental precept that an

unacceptable proposal cannot serve as the basis for a contract award." *Id.* (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 448 (Fed. Cir. 1996)).

In addition, Plaintiff claims that DLA's explanation for finding both its proposal and Oakland's proposal acceptable is flimsy, as the only contemporaneous explanation was the "rushed email from an evaluation team member that was sitting on another panel." *Id.* (citing AR 3112). Instead, Plaintiff argues, Defendant relies on a brand new post-hoc justification for finding Oakland acceptable in the Award Decision Document Addendum (AR at 3190–91), which states that DLA's identification of the deficiency was due to its "misinterpretation of vendor's approach." *Id.* at 22. Plaintiff states that this explanation "is found nowhere else in the record and conflicts with the repeated evaluation findings from the technical evaluation board." *Id.* (citing AR 3114–15; AR 3190–91).

In response, DLA argues that the internal emails reflect that the Agency recognized and then explained how the disparate treatment in the evaluation occurred. Def. Resp. at 3–4; *see also* AR 3114 (referencing how the DLA "missed a key step," "overlooked" a common assumption of SAP contracts, and had split up evaluation teams). Additionally, Defendant reiterates that DLA did not deem Plaintiff's proposal deficient at any point. *See* Def. Resp. at 3; OA Tr. 63:5–7 ("[T]he [A]gency's position now and in its ultimate determination is that there is no deficiency."). DLA states that, while the explanation for the ultimate outcome of the corrective reevaluation of the Hybrid Methodology Language is "admittedly spare," it nevertheless is present in the record. *Id.* at 4. *First*, in its final evaluation of Oakland's proposal, after corrective action, DLA explained that "'[t]he initial identification of deficiencies in this area was based on a misinterpretation of the vendor's approach.'" Def. Reply at 3 (quoting AR 3185). *Second*, in the original evaluation of

Plaintiff's remedied Hybrid Agile Methodology section, DLA explained in more detail why this language could be considered acceptable:

> Vendor's proposal revision stated that they will use a Hybrid Agile method coupled with a traditional waterfall delivery. Vendor stated "Business involvement is limited to a few subject matter experts for each Agile Team." Highlighting [subject matter experts] gets to the right level of support. This deficiency has been resolved.

AR 1711. Therefore, Defendant argues that applying this standard equally and deeming Oakland acceptable merely remedied the disparate treatment Oakland had previously received. Def. Resp. at 2.

The Court finds that DLA acted rationally when, during its self-initiated corrective action, it considered Oakland acceptable and subsequently awarded it the contract. The Court first notes that the final technical evaluation of Oakland is "entitled to a presumption of regularity." *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)). When examining the record for DLA's rational basis, the Court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation omitted).

Here, the parties agree that the language at issue in both proposals was completely identical. *See* Def. Mot. at 10; Oak. Resp. at 4; OA Tr. 15:10, 72:16. Yet, at the time of the first award, only Plaintiff's was deemed acceptable. Internal DLA emails then reflect its self-identification of its disparate treatment of Oakland and Plaintiff. AR 3115 ("[T]he tech evals were different but should have been the same"). The record also identifies two reasons for the discrepancy: (i) DLA "missed a key step" when it "overlooked" a common assumption of SAP contracts (that the language is usually identical); and (ii) the evaluation teams were split up for expediency, resulting in different personnel conducting Oakland's and Plaintiff's evaluations. AR 3114, 3115. The result was a "misinterpretation" of Oakland's proposed Hybrid Agile approach.

AR 3185.  Once DLA discovered there was identical language in both, it engaged in corrective action to correct the "issue" with the evaluations.  AR 3118.

A reasonable explanation for why the same language at issue should be deemed acceptable also appears in the record, twice.  First, in an earlier evaluation, Plaintiff's Hybrid Agile Methodology section was determined to be acceptable because it "highlight[ed] [subject matter experts]" which "gets to the right level of support."  AR 1711.  Plaintiff acknowledges that this initial evaluation of its proposal language as acceptable had a rational basis.  OA Tr. 75:1 ("Yes, there is a basis there"), 75:5 (affirming "Right," in response to the Court's inquiry that there is "[a] rational basis for finding ASI's proposal technically acceptable in this regard.").  Meanwhile, Oakland, which used identical language and also referenced "subject matter experts" on its Agile teams, was penalized for not identifying the "correct team."  AR 1787.  Later, in its final technical evaluations contemporaneous with the Award Decision Addendum, DLA's evaluation of Plaintiff's proposal reiterates the reasoning for finding the language acceptable.  *See* AR 3175. The lowest-price, technically acceptable award formula did the rest; Oakland's lower price merited the award.  AR 3192.

Nor do DLA's final technical evaluations constitute post-hoc reasoning, as Plaintiff claims; instead they reflect contemporaneous evaluations, released with the award decision addendum. The Agency is entitled to rely on its evaluation documents in its decision making, and that reliance is "entitled to a presumption of regularity."  *Impresa*, 238 F.3d at 1338 (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626–27 (1986)).  Accordingly, the record demonstrates that—contrary to Plaintiff's assertion that the record is "without any explanation [for the final outcome of the evaluations] or attempt to reconcile the conflicting evaluations"—DLA has explained its initial

error, the reason for that error, and the rational basis for the outcome of its corrective re-evaluation. Pl. MJAR at 20.

### C.    Awarding on the Descoped Solicitation

Finally, Plaintiff argues that when DLA reevaluated and awarded to Oakland based on a purportedly inadequate solicitation, DLA's actions were arbitrary and capricious.  Pl. Resp. at 11. Even if Plaintiff had not waived this argument under *Blue & Gold* (which it did, *see supra* I), it still would fail on the merits.

Plaintiff claims that DLA has "fail[ed] to amend the solicitation to reflect the Agency's actual minimum needs" in an arbitrary and capricious manner.  Pl. MJAR at 8.  Plaintiff surmises that DLA "arbitrarily descoped critical tasking . . . based on the demands of DOGE employees that had no connection to DLA and no understanding of DLA's requirements for the ERP platform overhaul."  *Id.* at 19 (citing AR at 3565).[10]  In support of this view, Plaintiff points to the fact that the Agency descoped approximately 30% of the work under the original PWS.  Pl. MJAR at 25. The work removed included "change management, training, and organizational alignment," which are "essential" to the modernization of the ERP platform, as they "ensure that users can effectively use the upgraded platform."  *Id.* (citing AR 688–91).  The descoped work included circulating training material, ensuring profiles are created, and preparing users for Go Live, all of which are purportedly "baseline" requirements.  *Id.*  As support for categorizing these tasks as "baseline," Plaintiff seems to say that it is self-evident, and supported by the Government's indication that it intends to provide some of these services itself.  Pl. Reply at 13 ("The fact that DLA acknowledges that it still intends to provide this training is empirical evidence that it is indeed a baseline

---

[10] At oral argument, Plaintiff's counsel conceded that, according to the record, DOGE did not look at the technical evaluations or technical proposals.  *See* OA Tr. 11:7–12.

requirement.").  Procuring these services from another source would, according to Plaintiff, be "irrational," because consolidation would permit "far greater efficiencies."  Pl. MJAR at 26. Furthermore, according to Plaintiff, procuring elsewhere would cost "significantly more money, leading to a less efficient and effective outcome, and, in turn, a less effective use of taxpayer funds."  *Id.* at 26–27.  Plaintiff again surmises, without any citation to the record, that "DLA does not have the manpower or resources to accomplish all of the tasks that were descoped."  *Id.* at 26. Plaintiff points out that, despite Defendant's claims that it could accomplish some of these services itself, DLA's Limited Source Justification states that only SAP Public Services, Inc., or its authorized providers can fulfill the procurement's requirements, due to the proprietary nature of SAP software.  Pl. Reply at 13 (citing AR 6).

Defendant replies that Plaintiff has not explained why the two areas descoped (training materials and assessments of the modernization effort on users) are "baseline."  Def. Resp. at 7. Even if these categories were necessary, Defendant adds, "the solicitation does still require training development in several ways."  *Id.* (citing AR 679, 687).  "More to the point, DLA is in the best position to evaluate its needs."  *Id.* at 7–8 (citing *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 318 (2020)).  Defendant explains that "DLA will offset these reductions through increased insourcing and active involvement by the existing Government workforce."  *Id.* at 8.  At bottom, however, Defendant argues that Plaintiff is essentially arguing that the Agency is prejudiced by the descoping which the Agency itself determined was necessary and appropriate. *Id.* at 8–9.

Defendant is correct.  "[D]etermining an agency's minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'"  *Savantage Fin. Servs.* 595 F.3d 1282, 1286 (Fed. Cir. 2010) (quoting *Wit Assocs., Inc. v. United States*, 62

Fed. Cl. 657, 662 (2004)).  For Plaintiff to successfully demonstrate that DLA's determination was improper, the decision must be "so plainly unjustified as to lack a rational basis."  *Id.* at 1287. Plaintiff has not met that standard here.  Whether DLA will practice greater or lesser efficiency by consolidating or eliminating tasks, does not show a lack of any rational basis.  Although Plaintiff lists many tasks that were descoped, Plaintiff has not established that these are minimum, must-have requirements of the solicitation.  *See* Pl. MJAR at 25–26; Pl. Reply at 13.

Even if Plaintiff is correct that some of the descoped tasks cannot be accomplished in-house because they require a licensed provider of SAP services, it has not established that these tasks need to be accomplished at all.  Assuming that the Court were to concur that some sort of training is a baseline requirement, it cannot substitute its own judgment for DLA's as to *how much* training is required—and, as Defendant points out, the solicitation still retains some training requirements.  Def. Resp. at 7 (citing AR at 679, 687); *see Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983) ("[A] court is not to substitute its judgment for that of the agency."); *Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed. Cir. 2006) (same).  All in all, given the deference proper to an agency's determinations of its own needs, DLA is in a far better position to determine its own basic needs than Plaintiff or the Court. Accordingly, even assuming that Plaintiff did not wave its descoping argument under *Blue & Gold*, Plaintiff still cannot prevail on the merits of this argument.

### D.    Prejudice

Finally, even assuming, *arguendo*, that DLA's actions were arbitrary and capricious, Plaintiff would still not be able to sustain its protest because it has not demonstrated that it has suffered prejudice.  As noted, in reviewing every bid protest, the Court must consider whether the alleged errors prejudiced the protestor.  *DynCorp Int'l* 10 F.4th at 1308 (Fed. Cir. 2021) (citing *Bannum*, 404 F.3d at 1351); *see supra* at 12.  Plaintiff contends that finding both "technically

unacceptable" proposals to be acceptable was prejudicial because "*[b]ut for* that error, ASI would either have retained its award or DLA would have reopened discussions with ASI." Pl. Reply at 11 (emphasis in original). Plaintiff also contends that finding both proposals unacceptable would still prejudice it because "ASI has not been afforded an equal opportunity to address the deficiency through discussions. Either way, ASI is prejudiced." *Id.*

The Court rejects Plaintiff's argument for several reasons. First, Plaintiff has not sufficiently tied its harm to the action it challenges. "The correction of an error must yield a different result in order for that error to have been harmful and thus prejudice a substantial right." *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019). In other words, plaintiffs must show "harm specific to the asserted error." *G4S Secure Integration LLC v. United States*, 159 Fed. Cl. 249, 262 (2022) (citing *Labatt*, 577 F.3d at 1381). Here, Plaintiff's path to prejudice is long and "requires jumping through multiple theoretical hoops." *Id.* at 254. As Plaintiff's counsel described in oral argument, "If [the Agency] say[s] [the proposal] [is] deficient and we're going to give ASI an opportunity to respond to them in that scenario, [Plaintiff] could answer it in a way that satisfied them." OA Tr. 34:15–19. Said differently, if the Court enjoined performance of the contract and declared that DLA was incorrect for failing to evaluate Plaintiff and Oakland as both deficient, and the Agency decided to cancel the solicitation or reopen discussions, and Plaintiff corrected its deficiency and/or lowered its price, then it is possible that Plaintiff would win the award. "This mere possibility does not meet the bar the Federal Circuit set for prejudice." *G4S Secure Integration*, 159 Fed. Cl. at 258. (citing *Bannum*, 404 F.3d at 1358).

Indeed, Plaintiff's position becomes wholly untenable by the simple fact that both Oakland and Plaintiff had *identical language* in their Hybrid Agile Methodology sections, and so their

technical evaluations rise and fall together. *Compare* AR 1598–99 *with* 1678. For this reason, as Defendant suggests, Plaintiff is in a double-bind: if Plaintiff's proposal is acceptable, then Oakland's is acceptable as well, and Plaintiff rightly lost the procurement based on the lowest-priced technically acceptable formula. Def. Resp. at 5. On the other hand, if Plaintiff's proposal is deficient, then it has no standing to protest, as it never would have won. *Id.* For this reason, it is incomprehensible that finding the Hybrid Agile Methodology language unacceptable for Oakland would have allowed Plaintiff, who shared that language, to have "retained its award." Pl. Reply at 11.

The same principle applies to Plaintiff's argument that it was purportedly prejudiced by its lack of discussions with DLA. If the language was never deficient, then ASI could not have been prejudiced by not being given an opportunity to address a non-existent deficiency. If Plaintiff's proposal language ought to have been deemed deficient but was not, then it "benefitted from the same error," as Oakland, and so has suffered no prejudice. *DevTech*, 176 Fed. Cl. at 325–26; *see G4S Secure Integration*, 159 Fed. Cl. at 258 (citing *Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1347 (Fed. Cir. 2021) ("[W]hen an agency waives requirements equally for different offerors, no prejudice results."). Accordingly, Plaintiff was not prejudiced, and "non-prejudicial errors in a bid process do not automatically invalidate a procurement." *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009).

### E.    Injunctive Relief

The Court considers four factors when deciding whether to grant injunctive relief: (1) whether the plaintiff has succeeded on the merits, (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) whether the balance of hardships to the respective parties favors granting an injunction, and (4) whether the public interest is served by granting an injunction. *Centech*, 554 F.3d at 1037. Success on the merits is "the most important factor

required to enjoin the award of [a] contract." *Blue & Gold*, 492 F.3d at 1312; *see Obsidian Sols. Grp., LLC v. United States*, 54 F.4th 1371, 1376 (Fed. Cir. 2022) ("There can be no injunctive relief without a corresponding prevailing claim."). In other words, a "plaintiff who cannot demonstrate success upon the merits cannot prevail upon a motion for injunctive relief." *Insight Pub. Sector, Inc. v. United States*, 161 Fed. Cl. 760, 817 (2022) (quoting *By Light Pro. IT Servs., Inc. v. United States*, 131 Fed. Cl. 358, 367 (2017)); *see also Dell Fed. Sys.*, 906 F.3d at 999 ("[P]roving success on the merits is a necessary element for a permanent injunction."). Here, Plaintiff has not shown it is entitled to succeed on the merits; therefore, the Court denies its request for injunctive relief.

<u>**CONCLUSION**</u>

Accordingly, for the reasons stated above, the Court **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 34). The Court **GRANTS IN PART** and **DENIES IN PART AS MOOT** Defendant's Partial Motion to Dismiss (ECF No. 35), and **GRANTS** Defendant and Intervenor-Defendant Oakland's Motions for Judgment on the Administrative Record (ECF Nos. 35 and 33). The Clerk of Court is **DIRECTED** to enter Judgment accordingly.

The parties are directed to **CONFER** and **FILE** a Notice by February 13, 2026, attaching a proposed public version of this Sealed Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

Washington, D.C.
January 30, 2026